IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| APT GROUP INC. d/b/a MOTOVOX, a<br>Missouri corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>MONSTER MOTO, LLC, a Texas limited<br>liability company, OLEN RICE, an individual,<br>ROBERT A RICE, SR., an individual, JOHN<br>UMSTED, an individual, KENNETH<br>FRANCIS, an individual, and BECK<br>SALANDER, an individual,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  4:14-cv-546<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff APT Group, Inc. d/b/a MotoVox hereby complains against Monster Moto, LLC, Olen Rice, Robert A. Rice, Sr., John Umsted, Kenneth Francis and Beck Salander as follows:

## NATURE OF THE ACTION

1.      Defendants Olen Rice, Robert Rice, Sr., John Umsted, Kenneth Francis and Beck Salander are all former employees of or consultants to APT Group, Inc. d/b/a MotoVox, a company that manufactures and sells motorized minibikes, go-karts, and electric junior motorbikes, among other things.  In early 2013, Olen Rice, Robert Rice, Sr., John Umsted, Kenneth Francis and Beck Salander left MotoVox to go to work for or otherwise assist defendant Monster Moto to manufacture and sell a minibike identical in nearly all respects to MotoVox's products by disclosing trade secrets and confidential information learned through their

association with MotoVox, breaching contracts with MotoVox, and breaching fiduciary duties to MotoVox as equity holders.

## PARTIES

2.      Plaintiff APT Group, Inc. d/b/a MotoVox ("MotoVox") is a Missouri corporation with its principal place of business in Kansas City, Missouri.  MotoVox is the successor-in-interest to American Performance Technologies, LLC ("APT") and APT Powersport and Utility Products, LLC ("APTPU").

3.      Defendant Monster Moto, LLC ("Monster Moto") is a Texas limited liability company with its principal place of business in Dallas, Texas.

4.      Defendant Olen Rice is an individual who resides in Green Bay, Wisconsin.

5.      Defendant Robert A. Rice, Sr. ("Robert Rice") is an individual who resides in Lee's Summit, Missouri.

6.      Defendant John Umsted ("Umsted") is an individual who resides in Olathe, Kansas.

7.      Defendant Kenneth Francis ("Francis") is an individual who resides in University City, Missouri.

8.      Defendant Beck Salander ("Salander") is an individual who resides in China.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under Section 39 of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and 28 U.S.C. §§ 1331 and 1338.  This Court also has jurisdiction over MotoVox's related state law claims under 35 U.S.C. §§ 1338 and 1367.

10.      This Court has personal jurisdiction over Monster Moto because of Monster Moto's contacts with the forum, including Monster Moto's doing business in Missouri.  Personal jurisdiction over Monster Moto is also appropriate because Monster Moto has promoted,

2

distributed, offered to sell and sold products in Missouri that infringe MotoVox's trademark and trade dress rights.

11.     This Court has personal jurisdiction over Olen Rice because of his contacts with the forum.  In particular, Olen Rice entered a Service Agreement that is germane to this case with APTPU, a limited liability company that is the predecessor-in-interest of MotoVox.  The Service Agreement between Olen Rice and APTPU was entered in Jackson County, Missouri.  The Service Agreement provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Missouri."  Also, under that Service Agreement, Olen Rice became a unit holder in APTPU.  Paragraph 14.10 of APTPU's Operating Agreement provides that "[j]urisdiction and Venue for any suit arising out of this Agreement shall be exclusively in the State Courts of Jackson County, Missouri or the United States District Court for the Western District of Missouri, located in Kansas City, Missouri."  Olen Rice's units have subsequently been converted to shares of MotoVox.

12.     This Court has personal jurisdiction over Robert Rice because he resides in Lee's Summit, Missouri.

13.     This Court has personal jurisdiction over Umsted because of his employment agreement with APT, which states "[t]he parties agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in the state or federal courts of Kansas City, Missouri. The parties consent to such jurisdiction, agree that venue will be proper in such courts and waive any objections based upon forum non conveniens."

14.     This Court has personal jurisdiction over Kenneth Francis because of his employment agreement with APT, which states "[t]he parties agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in the state or federal courts of Kansas City, Missouri.  The parties consent to such jurisdiction, agree that venue will be proper in such courts and

3

waive any objections based upon <u>forum</u> <u>non</u> <u>conveniens</u>."  Also, Mr. Francis resides in University City, Missouri.

15.     This Court has personal jurisdiction over Beck Salander because of his contacts with the forum.  In particular, he was employed by APTPU, a Missouri limited liability company with its principal place of business in Missouri, and MotoVox's predecessor-in-interest.

16.     Venue is appropriate under 28 U.S.C. § 1391 and the venue agreements mentioned above.

<u>**GENERAL ALLEGATIONS**</u>

17.     For many years, MotoVox has designed, manufactured and sold quality motorized minibikes, go-karts, scooters and electric junior motorbikes.

18.     Before they were merged into MotoVox in early 2014, APT owned a majority of APTPU, and APT and APTPU utilized and shared one another's trade secrets and confidential information, including but not limited to design information, customer and sales information, pricing information and manufacturing information.

19.     In June 2011, MotoVox introduced to the market a new line of minibikes identified using model numbers MBxXSe, MBX10, MBX11, MBX12, and MBX20 (the "MBX Minibikes").

20.     The MBX Minibikes were a revolutionary redesign of the traditional minibike.

21.     A true and correct copy of a photograph of a traditional minibike is attached hereto as **Exhibit A**.

22.     A true and correct copy of a photograph of the MBX10 is attached hereto as **Exhibit B**.

23.     As depicted in Exhibit B, the MBX Minibikes contained many new and unique design elements, including but not limited to handlebar risers that sweep toward the rider,

4

stylized fenders, foot pegs, engine, kickstand, a unique back wheel and tire tread design, a stylized red seat, and a revolutionary black teardrop frame design with an attached number plate.

24.     MotoVox has enjoyed considerable success marketing the MBX Minibikes, which have been sold in Sears, Kmart, Costco and other national and local dealers.

25.     Until approximately June 2013, Olen Rice was an independent representative of MotoVox by virtue of a Service Agreement effective March 23, 2010.  Under that Service Agreement, Olen Rice became a unit holder in APT and APTPU.  Those units have subsequently been converted to shares of MotoVox.

26.     Until approximately May 2013, Robert Rice was employed by APT, MotoVox's predecessor-in-interest, as a sales manager.  As part of his employment agreement, Robert Rice became a unit holder in APTPU.  Those units have subsequently been converted to shares of MotoVox.

27.     Until approximately April 2013, Umsted was employed by APT, MotoVox's predecessor-in-interest, as Executive Vice President of Shared Services.  Umsted's responsibilities included customer service, logistics, administration, parts, warehouse, service and warranties.  As part of his employment agreement, Umsted became a unit holder in both APT and APTPU.  Those units have subsequently been converted to shares of MotoVox.

28.     Until July 2013, Francis was employed by APTPU, MotoVox's predecessor-in-interest, as Senior Vice President of Product Development.  His duties included engineering new product designs and developing MotoVox's supply chain in Asia.  As part of his employment agreement, Francis became a unit holder in both APT and APTPU.  Those units have subsequently been converted to shares of MotoVox.

29.     Until June 2013, Salander was employed by APTPU.  His responsibilities included manufacturing process compliance, quality control, and production schedules.

30.     Because of their employment and/or contractual relationships with APT and/or APTPU, Olen Rice, Robert Rice, Umsted, Francis and Salander all had access to MotoVox's trade secrets and confidential information, including but not limited to design information, customer and sales information, pricing information and manufacturing information.

31.     Olen Rice, Robert Rice, Umsted, Francis and Salander are now all either employed by Monster Moto or are providing consulting services to Monster Moto.  In violation of their contracts, statutory duties or fiduciary duties to MotoVox, Olen Rice, Robert Rice, Umsted, Francis and Salander have wrongfully disclosed MotoVox trade secrets to Monster Moto and have wrongfully assisted Monster Moto in competition against MotoVox to MotoVox's detriment.

32.     As a result of the wrongful conduct of Olen Rice, Robert Rice, Umsted, Francis and Salander, in approximately March 2014, Monster Moto introduced a minibike to the market using model number MMB80.  A true and correct copy of a photograph of Monster Moto's MMB80 is attached hereto as **Exhibit C**.

33.     Monster Moto has copied many of the MBX Minibikes' trade dress design elements, including but not limited to handlebar risers that sweep toward the rider, stylized fenders, foot pegs, engine, kickstand, a unique back wheel and tire tread design, a stylized red seat, and a revolutionary black teardrop frame design with an attached number plate.

34.     Attached hereto as **Exhibit D** are overlays of the MBX10 and the MMB80 showing how closely Monster Moto has copied the MBX Minibikes' trade dress design elements.

6

35.     Monster Moto was able to produce a copy of the MBX Minibikes in such a short period of time because Olen Rice, Robert Rice, Umsted, Francis and Salander misappropriated MotoVox's trade secrets, including design documentation and information regarding MotoVox's Asian supply chain.

36.     In fact, at least one of MotoVox's former manufacturers, Zhejiang Shengqi Motion Apparatus Co., Ltd., is engaged in manufacturing for Monster Moto using MotoVox's tooling and designs.

**FIRST CAUSE OF ACTION**
**(For Misappropriation of Trade Secrets Against Monster Moto,**
**Mo. Rev. Stat. § 417.450, et seq.)**

37.     MotoVox incorporates paragraphs 1 through 36 as though fully set forth herein.

38.     Monster Moto has acquired MotoVox trade secrets from Olen Rice, Robert Rice, Umsted, Francis and Salander in violation of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, *et seq*.

39.     Monster Moto knew or had reason to know that knowledge of the trade secrets was acquired by Olen Rice, Robert Rice, Umsted, Francis and Salander under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through persons who owed a duty to MotoVox to maintain their secrecy or limit their use.

40.     The trade secrets at issue include but are not limited to design information, customer and sales information, pricing information and manufacturing information. This information derives actual economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

41.     As a direct and proximate result of Monster Moto's misappropriation of MotoVox's trade secrets, MotoVox has been damaged in an amount to be proven at trial, including both its actual losses cause by Monster Moto's misappropriation as well as Monster Moto's unjust enrichment.

42.     In the alternative, MotoVox seeks a reasonable royalty for Monster Moto's unauthorized use of MotoVox's trade secrets.

43.     MotoVox also seeks temporary and permanent injunctive relief to prevent Monster Moto from further utilizing its trade secrets.

44.     MotoVox also seeks punitive damages because Monster Moto's actions were outrageous due to Monster Moto's evil motive and reckless indifference to MotoVox's rights.

### SECOND CAUSE OF ACTION
**(For Misappropriation of Trade Secrets Against Olen Rice, Robert Rice, Umsted, Francis and Salander, Mo. Rev. Stat. § 417.450, et seq.)**

45.     MotoVox incorporates paragraphs 1 through 44 as though fully set forth herein.

46.     Olen Rice, Robert Rice, Umsted, Francis and Salander have disclosed MotoVox trade secrets to Monster Moto in violation of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, *et seq*.

47.     Olen Rice, Robert Rice, Umsted, Francis and Salander disclosed MotoVox trade secrets to Monster Moto without the express or implied consent of MotoVox and at the time of the disclosure knew or had reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use or were derived from or through a person who owed a duty to the person seeking relief to maintain their secrecy or limit their use.

8

48.     The trade secrets at issue include but are not limited to design information, customer and sales information, pricing information and manufacturing information.  This information derives actual economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

49.     As a direct and proximate result of Olen Rice's, Robert Rice's, Umsted's, Francis's and Salander's misappropriation of MotoVox's trade secrets, MotoVox has been damaged in an amount to be proven at trial, including both its actual losses and Olen Rice's, Robert Rice's, Umsted's, Francis's and Salander's unjust enrichment.

50.     In the alternative, MotoVox seeks a reasonable royalty for Monster Moto's unauthorized use of MotoVox's trade secrets.

51.     MotoVox also seeks temporary and permanent injunctive relief to prevent Olen Rice, Robert Rice, Umsted, Francis and Salander from further disclosing and utilizing its trade secrets.

52.     MotoVox also seeks punitive damages because of Olen Rice's, Robert Rice's, Umsted's, Francis's and Salander's actions were outrageous due to their evil motive and reckless indifference to MotoVox's rights.

### THIRD CAUSE OF ACTION
**(For Breach of Contract Against Olen Rice)**

53.     MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

54.     On or about December 28, 2012, Olen Rice entered a written Service Agreement with APTPU.  By its terms, the Service Agreement was retroactive to March 23, 2010.

9

55. MotoVox is the successor-in-interest to APTPU's rights, duties and obligations under the Service Agreement.

56. The Service Agreement constitutes a valid and binding contract between Olen Rice and MotoVox.

57. MotoVox has performed all of its obligations under the Service Agreement.

58. The Service Agreement provides as follows:

While [Olen] Rice is providing services to [MotoVox] under this Agreement, Rice shall not willfully act contrary to the best interests of [MotoVox] in a manner that has a direct, material, adverse impact upon [MotoVox]. [Olen] Rice agrees that during the term of this Agreement, and for a period of one (1) year thereafter, he will not, either directly or indirectly, interfere with the ongoing employer/employee relationship with any of [MotoVox's] employees by hiring or enticing any such employees to leave the employ of [MotoVox].

(Service Agreement, ¶ 8.)

59. The Service Agreement also contains a section entitled "Nondisclosure of Trade Secrets and Confidential Information," which states as follows:

[Olen] Rice recognizes and acknowledges that in providing services to [MotoVox], he will become possessed of certain trade secrets and other valuable and confidential information concerning matters affecting or relating to the business of [MotoVox] and [its] customers. Such information may include, but is not limited to the names, addresses, and telephone numbers of customers and prospective customers of [MotoVox], the terms (including price terms) of contractual relations with such customers; the requirements of such customer or prospects; customer lists; financial, tax-related and/or personnel information regarding [MotoVox] and/or [its] customers; prospect lists; contact lists; contacts; processes and technology used in connection with [MotoVox's] services; computer-stored data; plans, specifications and programs; and other information that is relating to [MotoVox's] business methods and activities, customers, suppliers, vendors, personnel, personnel policies, consultants, agents, affiliates, assets, procedures, technical needs, developments, "know-how", projects, sales methods, marketing policies, plans, strategies and/or practices, operative policies and pricing formulas and strategies. [Olen] Rice recognizes and acknowledges that such information is valuable, special and essential to the successful and effective conduct of [MotoVox's] businesses, and has been developed or acquired by Company and APT at their own substantial cost and expense. Therefore, [Olen] Rice shall not, either during the term of this Agreement or anytime thereafter, use any of [MotoVox's] trade secrets or confidential information, or

10

disclose, divulge or otherwise communicate any of [MotoVox's] trade secrets or confidential information to any person, corporation, firm, company or business entity other than [MotoVox], for any reason or purpose whatsoever, except as necessary to perform services for [MotoVox] or as may be required by applicable law or authorized by the prior written consent of [MotoVox]. Further, upon the termination of this Agreement, regardless of reason, [Olen] Rice shall promptly return to [MotoVox] any and all written materials, documents, plans, computer discs or other computer stored or generated material in his possession obtained or created as a result of providing services under this Agreement which relate to the business activities of [MotoVox] and/or [its] customers including any and all copies or reproductions thereof.

60.     Olen Rice has breached the Service Agreement by either becoming employed by or entering a consulting agreement with Monster Moto, enticing MotoVox employees to leave MotoVox's employ (including but not limited to Robert Rice) and by disclosing MotoVox trade secrets and confidential information to Monster Moto.

61.     As a direct and proximate result of his breaches of the Service Agreement, MotoVox has been damaged in an amount to be proven at trial.

62.     MotoVox also seeks temporary and permanent injunctive relief to prevent Olen Rice further breaching the Service Agreement.

**FOURTH CAUSE OF ACTION**
**(For Intentional Interference with Contract**
**Against Monster Moto – Olen Rice Service Agreement)**

63.     MotoVox incorporates paragraphs 1 through 62 as though fully set forth herein.

64.     The Service Agreement between MotoVox and Olen Rice is a valid and binding contract.

65.     MotoVox is informed and believes and on that basis alleges that Monster Moto was aware at all relevant times of the Service Agreement between MotoVox and Olen Rice.

11

66.     Notwithstanding that knowledge, Monster Moto intentionally interfered with the Service Agreement between MotoVox and Olen Rice by inducing Olen Rice to breach the Service Agreement as described in paragraphs 57 through 59, above, without justification.

67.     As a direct and proximate result of Monster Moto's interference with the Service Agreement between MotoVox and Olen Rice, MotoVox has been damaged in an amount to be proven at trial.

68.     MotoVox also seeks punitive damages because of Monster Moto's reckless indifference to MotoVox's contract rights.

**FIFTH CAUSE OF ACTION**
**(For Breach of Contract Against Umsted)**

69.     MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein

70.     In or about January 2012, Umsted entered into an employment agreement with APT that was memorialized in a writing (the "Umsted Employment Agreement").

71.     The Umsted Employment Agreement is a valid and binding contract.

72.     MotoVox has performed all of its obligations under the Umsted Employment Agreement.

73.     The Umsted Employment Agreement provides as follows:

> During the period of Umsted's employment by [MotoVox], Umsted shall not willfully act contrary to the best interests of [MotoVox], or its members, managers, officers or employees, in a manner that has a direct, material, adverse impact upon [MotoVox]. Umsted agrees that during the term of his employment with [MotoVox] and for a period of one (1) year thereafter, he will not, either directly or indirectly, interfere with the ongoing employer/employee relationship with any of [MotoVox's] employees by hiring or enticing any such employees to leave the employ of [MotoVox].

(Umsted Employment Agreement, ¶ 8.)

74.     The Umsted Employment Agreement also contains a section entitled "Nondisclosure of Trade Secrets and Confidential Information, which states as follows:

12

Umsted recognizes and acknowledges that during the course of his employment with the Company, he will become possessed of certain trade secrets and other valuable and confidential information concerning matters affecting or relating to the business of the Company, MotoVox and their customers.  Such information may include, but is not limited to: the names, addresses and telephone numbers of customers and prospective customers of the Company and/or MotoVox; the terms (including price terms) of contractual relations with such customers; the requirements of such customers or prospects; customer lists; financial, tax-related and/or personnel information regarding the Company, MotoVox and/or their customers; prospect lists; contact lists; contracts; processes and technology used in connection with the Company's and/or MotoVox' services; computer-stored data; plans, specifications and programs; and other information relating to the Company's and/ or MotoVox' business methods and activities, customers, suppliers, vendors, personnel, personnel policies, consultants, agents, affiliates, assets, procedures, technical needs, developments, "know-how", projects, sales methods, marketing policies, plans, strategies and/or practices, operative policies and pricing formulas and strategies.  Umsted recognizes and acknowledges that such information is valuable, special and essential to the successful and effective conduct of the Company's and MotoVox' businesses, and has been developed or acquired by the Company and MotoVox at their own substantial cost and expense. Therefore, Umsted shall not, either during the period of employment with the Company or anytime thereafter, use any of the Company's and/ or MotoVox' trade secrets or confidential information, or disclose, divulge or otherwise communicate any of the Company's trade secrets or confidential information to any person, corporation, firm, company or business entity other than the Company or MotoVox, for any reason or purpose whatsoever, except as necessary to perform services for the Company or MotoVox or as may be required by applicable law or authorized by the prior written consent of the Company. Further, upon the termination of his employment with the Company, regardless of reason, Umsted shall promptly return to the Company and MotoVox any and all written materials, documents, plans, computer discs or other computer-stored or generated material in his possession obtained or created as a result of his employment which relate to the business activities of the Company, MotoVox and/or their customers, including any and all copies or reproductions thereof.

(Umsted Employment Agreement, ¶ 9.)

75.     Umsted has breached the Service Agreement by either becoming employed by or entering a consulting agreement with Monster Moto, enticing MotoVox employees to leave MotoVox's employ, and by disclosing MotoVox trade secrets and confidential information to Monster Moto.

13

76.     As a direct and proximate result of his breaches of the Service Agreement, MotoVox has been damaged in an amount to be proven at trial.

77.     MotoVox also seeks temporary and permanent injunctive relief to prevent Umsted from further breaching the Service Agreement.

### SIXTH CAUSE OF ACTION
**(For Intentional Interference with Contract**
**Against Monster Moto – Umsted Employment Agreement)**

78.     MotoVox incorporates paragraphs 1 through 52 and 69 through 77 as though fully set forth herein.

79.     The Umsted Employment Agreement between MotoVox and Umsted is a valid and binding contract.

80.     MotoVox is informed and believes and on that basis alleges that Monster Moto was aware at all relevant times of the Umsted Employment Agreement.

81.     Notwithstanding that knowledge, Monster Moto intentionally interfered with the Umsted Employment Agreement by inducing Umsted to breach the Umsted Employment Agreement as described in paragraphs 72 through 74, above, without justification.

82.     As a direct and proximate result of Monster Moto's interference with the Umsted Employment Agreement, MotoVox has been damaged in an amount to be proven at trial.

83.     MotoVox also seeks punitive damages because of Monster Moto's reckless indifference to MotoVox's contract rights.

### SEVENTH CAUSE OF ACTION
**(For Breach of Contract Against Francis)**

84.     MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

85.     On or about March 31, 2012, Francis entered into a written employment agreement with APT (the "Francis Employment Agreement").

86.     The Francis Employment Agreement is a valid and binding contract.

87.     MotoVox has performed all of its obligations under the Francis Employment Agreement.

88.     The Francis Employment Agreement provides as follows:

> During the period of Umsted's employment by [MotoVox], Francis shall not willfully act contrary to the best interests of [MotoVox], or its members, managers, officers or employees, in a manner that has a direct, material, adverse impact upon [MotoVox]. Francis agrees that during the term of his employment with [MotoVox] and for a period of one (1) year thereafter, he will not, either directly or indirectly, interfere with the ongoing employer/employee relationship with any of [MotoVox's] employees by hiring or enticing any such employees to leave the employ of [MotoVox].

(Francis Employment Agreement, ¶ 8.)

89.     The Francis Employment Agreement also contains a section entitled "Nondisclosure of Trade Secrets and Confidential Information," which states as follows:

> Francis recognizes and acknowledges that during the course of his employment with the Company, he will become possessed of certain trade secrets and other valuable and confidential information concerning matters affecting or relating to the business of the Company, MotoVox and their customers. Such information may include, but is not limited to: the names, addresses and telephone numbers of customers and prospective customers of the Company and/or MotoVox; the terms (including price terms) of contractual relations with such customers; the requirements of such customers or prospects; customer lists; financial, tax-related and/or personnel information regarding the Company, MotoVox and/or their customers; prospect lists; contact lists; contracts; processes and technology used in connection with the Company's and/or MotoVox' services; computer-stored data; plans, specifications and programs; and other information relating to the Company's and/ or MotoVox' business methods and activities, customers, suppliers, vendors, personnel, personnel policies, consultants, agents, affiliates, assets, procedures, technical needs, developments, "know-how", projects, sales methods, marketing policies, plans, strategies and/or practices, operative policies and pricing formulas and strategies. Francis recognizes and acknowledges that such information is valuable, special and essential to the successful and effective conduct of the Company's and MotoVox' businesses, and has been developed or acquired by the Company and MotoVox at their own substantial cost and expense.

Therefore, Francis shall not, either during the period of employment with the Company or anytime thereafter, use any of the Company's and/ or MotoVox' trade secrets or confidential information, or disclose, divulge or otherwise communicate any of the Company's trade secrets or confidential information to any person, corporation, firm, company or business entity other than the Company or MotoVox, for any reason or purpose whatsoever, except as necessary to perform services for the Company or MotoVox or as may be required by applicable law or authorized by the prior written consent of the Company. Further, upon the termination of his employment with the Company, regardless of reason, Francis shall promptly return to the Company and MotoVox any and all written materials, documents, plans, computer discs or other computer-stored or generated material in his possession obtained or created as a result of his employment which relate to the business activities of the Company, MotoVox and/or their customers, including any and all copies or reproductions thereof.

(Francis Employment Agreement, ¶ 9.)

90.     Francis has breached the Service Agreement by either becoming employed by or entering a consulting agreement with Monster Moto, enticing MotoVox employees to leave MotoVox's employ, and by disclosing MotoVox trade secrets and confidential information to Monster Moto.

91.     As a direct and proximate result of his breaches of the Service Agreement, MotoVox has been damaged in an amount to be proven at trial.

92.     MotoVox also seeks temporary and permanent injunctive relief to prevent Francis from further breaching the Francis Employment Agreement.

**EIGHTH CAUSE OF ACTION**
**(For Intentional Interference with Contract**
**Against Monster Moto – Francis Employment Agreement)**

93.     MotoVox incorporates paragraphs 1 through 52 and 84 through 92 as though fully set forth herein.

94.     The Francis Employment Agreement between MotoVox and Francis is a valid and binding contract.

95. MotoVox is informed and believes and on that basis alleges that Monster Moto was aware at all relevant times of the Francis Employment Agreement.

96. Notwithstanding that knowledge, Monster Moto intentionally interfered with the Francis Employment Agreement by inducing Francis to breach the Francis Employment Agreement as described in paragraphs 87 through 89, above, without justification.

97. As a direct and proximate result of Monster Moto's interference with the Francis Employment Agreement, MotoVox has been damaged in an amount to be proven at trial.

98. MotoVox also seeks punitive damages because of Monster Moto's reckless indifference to MotoVox's contract rights.

### NINTH CAUSE OF ACTION
**(For Tortious Interference with Business Expectancies Against Monster Moto)**

99. MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

100. At all relevant times, MotoVox had valid business expectancies with customers like Sears, Kmart, Costco and other national and local dealers.

101. At all relevant times, Monster Moto has been aware of MotoVox's business relationships with these customers, learning of them through Olen Rice, Robert Rice, Umsted, Francis and/or Salander.

102. Monster Moto has interfered with MotoVox's business expectancies with these customers without justification, by telling them that MotoVox was having financial difficulties, was going out of business and/or was about to declare bankruptcy. At a minimum, MotoVox is informed and believes and on that basis alleges that Monster Moto told Sears that MotoVox was going bankrupt and that customers were leaving. Monster Moto made these representations through Olen Rice, Robert Rice, Umsted and Francis, knowing their fiduciary duties to MotoVox as shareholders and former employees.

17

103. As a direct and proximate result of Monster Moto's tortious interference with MotoVox's business expectancies, MotoVox has been damaged in an amount to be proven at trial.

104. MotoVox also seeks punitive damages because of Monster Moto's reckless indifference to MotoVox's rights.

## TENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Olen Rice, Robert Rice, Umsted and Francis)

105. MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

106. Olen Rice was a unit holder in APT and APTPU. Those units have been converted to shares in MotoVox.

107. Robert Rice was a unit holder in APTPU. Those units have been converted to shares in MotoVox.

108. Umsted was a unit holder in APT and APTPU. Those units have been converted to shares in MotoVox.

109. Francis was a unit holder in APT and APTPU. Those units have been converted to shares in MotoVox.

110. As unit holders in APT and/or APTPU, and now as shareholders of MotoVox, Olen Rice, Robert Rice, Umsted and Francis owed APT, APTPU and now owe MotoVox fiduciary duties.

111. Olen Rice, Robert Rice, Umsted and Francis have breached their fiduciary duties to APT, APTPU and MotoVox by leaving MotoVox to form, assist, become employed by, consult and/or otherwise assist Monster Moto to design, manufacture and sell the MMB80 minibike using MotoVox's trade secrets and by using MotoVox's trade dress to market the MMB80 minibike.

18

112.    As a direct and proximate result of Olen Rice's, Robert Rice's, Umsted's and Francis's breaches of their fiduciary duties to MotoVox, MotoVox has been damaged in an amount to be proven at trial.

113.    MotoVox also seeks punitive damages because of Olen Rice's, Robert Rice's, Umsted's and Francis's reckless indifference to MotoVox's rights.

114.    MotoVox also seeks temporary and permanent injunctive relief to prevent further breaches of fiduciary duties by these individuals.

**ELEVENTH CAUSE OF ACTION**
**(For Violation of Section 43(a) of the Lanham Act**
**Against Monster Moto – Trade Dress – Product Design)**

115.    MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

116.    The overall ornamental design of the MotoVox MBx10 minibike constitutes trade dress entitled to legal protection under Section 43(a) of the Lanham Act, including but not limited to handlebar risers that sweep toward the rider, stylized fenders, foot pegs, engine, kickstand, a unique back wheel and tire tread design, a stylized red seat, and a revolutionary black teardrop frame design with an attached number plate.

117.    Monster Moto has copied MotoVox's protectable trade dress and/or used similar trade dress in the design of its MMB80 minibike.

118.    Monster Moto's copying of MotoVox's protectable trade dress and/or its use of similar trade dress in the design of its MMB80 minibike is likely to mislead or confuse consumers into believe that a connection or association exists between MotoVox and Monster Moto.

119.    As a direct and proximate result of Monster Moto's copying and/or use of MotoVox's protectable trade dress in the design of Monster Moto's MMB80 minibike, MotoVox

19

has been damaged in an amount to be proven at trial, and MotoVox seeks treble damages under the Lanham Act.

120.    Monster Moto also acted with intent in copying MotoVox's trade dress, making this an exceptional case that justifies an award of attorneys' fees.

121.    MotoVox also seeks temporary and permanent injunctive relief to prevent Monster Moto from further utilizing its trade dress.

### TWELFTH CAUSE OF ACTION
#### (For Violation of Section 43(a) of the Lanham Act
#### Against Monster Moto – Trade Dress – Packaging)

122.    MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

123.    The design of the box in which the MBX Minibikes are sold constitutes trade dress entitled to legal protection under Section 43(a) of the Lanham Act. Examples of the distinct trade dress on the front of the box include: (1) a full product image that covers almost the entire left-hand side of the front of the box, (2) a photo featuring the rear disk brake, (3) a large list of features covering much of the right side of the front of the box, (4) a phrase in the upper-right hand corner of the front of the box that says "Attach the handlebars, gas it up and GO!," (5) instructions on the left hand side of the front of the box tilted 90 degrees counterclockwise that read "DO NOT LAY FLAT" and then "THIS SIDE UP."

124.    The side panel also contains trade dress entitled to legal protection. Examples of the distinct trade dress on the side of the box include: (1) a product profile image in the top third of the side panel, (2) a "Team Lift" warning in the upper left-hand corner of the side panel, (3) an image containing various warnings at the bottom of the side panel.

125.    Also, the predominant colors used on the MBX Minibikes boxes are red and black.

126.    Monster Moto has copied MotoVox's protectable trade dress and/or used similar trade dress in the design of the box for its MMB80 minibike.

127.    By way of example only, the MMB80 minibike box also displays (1) a full product image that covers almost the entire left-hand side of the front of the box, (2) a photo featuring the rear disk brake, (3) a large list of features covering much of the right side of the front of the box, (4) a phrase in the upper-right hand corner of the front of the box that says "ATTACH THE HANDLEBARS, FUEL IT UP AND GO!," (5) instructions on the left hand side of the front of the box tiled 90 degrees counterclockwise that read "DO NOT LAY FLAT" and then "THIS SIDE UP."

128.    The side panel of the MMB80 box displays (1) a product profile image in the top third of the side panel, (2) an exact copy of MotoVox's "Team Lift" warning in the upper left-hand corner of the side panel, (3) an exact copy of MotoVox's warnings at the bottom of the side panel.

129.    Also, the predominant colors used on the MMB80 box are red and black.

130.    Monster Moto's copying of MotoVox's protectable trade dress and/or its use of similar trade dress in the design of its MMB80 minibike packaging is likely to mislead or confuse consumers into believing that a connection or association exists between MotoVox and Monster Moto.

131.    As a direct and proximate result of Monster Moto's copying and/or use of MotoVox's protectable trade dress in the design of Monster Moto's MMB80 minibike packaging, MotoVox has been damaged in an amount to be proven at trial, and MotoVox seeks treble damages under the Lanham Act.

132.    Monster Moto also acted with intent in copying MotoVox's trade dress, making this an exceptional case that justifies an award of attorneys' fees.

133.    MotoVox also seeks temporary and permanent injunctive relief to prevent Monster Moto from further utilizing its trade dress.

**THIRTEENTH CAUSE OF ACTION**
**(Trademark Infringement Against Monster Moto)**

134.    MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

135.    MotoVox is the owner of two federally registered trademarks for the word mark "MOTOVOX," Registration Nos. 4293525 and 4013306.

136.    Monster Moto has infringed MotoVox's registered "MotoVox" trademark by offering identical goods for sale under the name "Monster Moto."

137.    Monster Moto's use of the term "Monster Moto" is likely to mislead consumers about the origin of Monster Moto's goods, creating confusion that Monster Moto's products are the same as those of MotoVox or that Monster Moto is somehow associated, affiliated, connected, approved, authorized or sponsored by MotoVox.

138.    As a direct and proximate result of Monster Moto's infringement of the MotoVox mark, MotoVox has been damaged in an amount to be proven at trial, and MotoVox seeks treble damages under the Lanham Act.

139.    MotoVox also seeks attorneys' fees under the Lanham Act.

140.    MotoVox also seeks temporary and permanent injunctive relief to prevent Monster Moto from further infringing its MotoVox mark.

**FOURTEENTH CAUSE OF ACTION**
**(Common Law Unfair Competition Against Monster Moto)**

141.    MotoVox incorporates paragraphs 1 through 52 as though fully set forth herein.

22

142.    By utilizing MotoVox's trade dress, as described in paragraphs 115-133 above, Monster Moto has engaged in conduct likely to deceive or mislead consumers that Monster Moto's business is that of MotoVox, that Monster Moto is an agent, affiliate or associate of MotoVox, or that Monster Moto's goods were produced, sponsored or approved by MotoVox.

143.    As a direct and proximate result of Monster Moto's acts of common law unfair competition, MotoVox has been damaged in an amount to be proven at trial.

144.    MotoVox also seeks punitive damages because of Monster Moto's outrageous conduct due to its reckless indifference to MotoVox's rights.

145.    MotoVox also seeks temporary and permanent injunctive relief to prevent Monster Moto from further engaging in common law unfair competition.

WHEREFORE, MotoVox prays for relief as follows:

(a)    On its first and second causes of action, for both actual damages and unjust enrichment or, in the alternative, a reasonable royalty, punitive damages and temporary and permanent injunctive relief.

(b)    On its third, fifth, and seventh causes of action, for compensatory damages, temporary and permanent injunctive relief, and attorneys' fees.

(c)    On its fourth, sixth, eighth and ninth causes of action, for compensatory and punitive damages.

(d)    On its tenth cause of action, for compensatory damages, punitive damages and temporary and permanent injunctive relief.

(e)    On its eleventh, twelfth and thirteenth causes of action, for damages, treble damages, attorneys' fees and temporary and permanent injunctive relief.

(f)     On its fourteenth cause of action, for compensatory damages, punitive damages and temporary and permanent injunctive relief.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, MotoVox demands a trial by jury on all issues so triable.


Dated: June 17, 2014                    LATHROP & GAGE LLP


                              By:     /s/ R. Cameron Garrison
                                      R. Cameron Garrison (MO #54064)
                                      CGarrison@lathropgage.com
                                      Luke M. Meriwether (MO # 59915)
                                      LMeriwether@lathropgage.com
                                      2345 Grand Boulevard, Suite 2200
                                      Kansas City, Missouri 64108-2618
                                      816.292.2000 (Tel)
                                      816.292.2001 (Fax)

                                      Brett L. Foster (*pro hac to be filed*)
                                      BFoster@hollandhart.com
                                      Mark A. Miller (*pro hac to be filed*)
                                      MMiller@hollandhart.com
                                      J. Andrew Sjoblom (*pro hac to be filed*)
                                      JASjoblom@hollandhart.com
                                      HOLLAND & HART LLP
                                      222 S. Main Street, Suite 2200
                                      Salt Lake City, Utah 84101
                                      801.799.5800 (Tel)
                                      801.799.5700 (Fax)

                                      *Attorneys for Plaintiff*
                                      *APT Group, Inc. d/b/a MotoVox*

24